# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF KENTUCKY
## CENTRAL DIVISION - LEXINGTON

| | |
|---|---|
| UNITED STATES OF AMERICA, | CRIMINAL NO. 5:18-116-KKC |
| **Plaintiff,** | |
| V. | **MEMORANDUM OPINION** |
| QUINICINO L. WAIDE and DOROTHY MAE WAIDE, | |
| **Defendants.** | |

**\*\*\* \*\*\* \*\*\***

This matter is before the Court on Quinicino Waide and Dorothy Waide's ("Defendants") Motion to Suppress (DE 55), which seeks to suppress all evidence supporting the charges against them. The Court held a Suppression Hearing to consider evidence relating to the Defendants' Motion. At that Hearing, defense counsel requested to file a supplemental brief further addressing the suppression issues, and the Court granted their request. (DE 63). The Court has reviewed the parties' briefs and the Court's Suppression Hearing transcript. For the reasons stated below, the Defendants' Motion to Suppress (DE 55) is **DENIED**.

## I. BACKGROUND

The Defendants were charged with a series of crimes after police secured and executed search warrants on the units of their duplex. The investigation culminating in the arrests of the Defendants began after firefighters and police were alerted to a shed fire that occurred at their neighbor's property. (DE 65 Supp. Hr'g Tr. at 4-5.) Captain Chris O'Bryan, an arson investigator, was assigned to attempt to determine the origin and cause of the fire. (DE 65 at 4.)

The shed fire was called in at 4:40 a.m. on July 23, 2018. (DE 65 at 30.) O'Bryan was called to the scene by fire crews and arrived at 5:30 a.m. the same morning. (DE 65 at 6.) O'Bryan spoke with the incident commander upon his arrival, who told him that items had been removed from the shed and appeared to have been set on fire. (DE 65 at 5.) The incident commander further informed O'Bryan that the house on the property was vacant and possibly used by squatters. (DE 65 at 5.) O'Bryan continued his investigation by looking around the area and attempting to locate potential witnesses. During his search, O'Bryan noticed sophisticated cameras mounted to a neighboring property—the duplex occupied by the Defendants. (DE 65 at 6.) At the time, no one appeared to be around. O'Bryan's investigation was briefly halted when he had to leave the scene to attend court on an unrelated matter. (DE 65 at 6.)

Later that day, O'Bryan returned to continue his investigation. Upon arrival, O'Bryan came into contact with Dorothy Waide, who was on the sidewalk outside her home. (DE 65 at 10.) O'Bryan asked Dorothy where she lived and whether she had seen anything the night of the fire. Dorothy identified her residence as Apartment 1 of the duplex neighboring the shed fire. (DE 65 at 10-11.) O'Bryan asked Dorothy about the cameras and asked if she had any video surveillance from the night of the fire. She replied that the cameras belonged to her son, Quinicino. (DE 65 at 11.) She further stated that all the equipment was upstairs in Apartment 3 of the duplex and that he probably would not release the footage. (DE 65 at 11.)

Dorothy assisted O'Bryan in trying to locate the 911 caller who reported the fire. (DE 65 at 11-12.) O'Bryan located the home of the caller, which was across the street from the shed fire. (DE 65 at 12.) O'Bryan spoke to a woman who identified herself as the 911 caller's mother. (DE 65 at 12.) She informed O'Bryan that her son called in the fire and that he had left for a visit to Las Vegas, Nevada. (DE 65 at 12.)

Dorothy Waide then took O'Bryan over to an individual who knew the owner of the property. (DE 65 at 31.) O'Bryan contacted the owner, Andrea Wallace, and informed her of the fire. (DE 65 at 31-32.) O'Bryan asked her about the contents of the shed. She replied that they were sentimental items from her deceased mother, including some antiques, a motorcycle, and a typewriter. (DE 65 at 32-33 and 44.) O'Bryan told her to ask around and see if anybody had any information regarding the fire. (DE 65 at 33.)

Shortly thereafter, O'Bryan came into contact with Quinicino near his home. (DE 65 at 12-13.) O'Bryan testified that he smelled an odor of marijuana coming from Quinicino. (DE 65 at 14.) O'Bryan asked Quinicino where he lived, and he identified that he lived in Apartment 3 of the duplex neighboring the shed fire. (DE 65 at 13.) O'Bryan explained his investigation and asked whether there was any way he could review the video surveillance footage from the night of the fire. (DE 65 at 13.) Quinicino refused to release the footage. (DE 65 at 13.) Following this encounter, O'Bryan concluded his investigation for the day.

The following day, July 24, 2018, O'Bryan resumed his investigation. That morning, he spoke again with the victim, Wallace. (DE 65 at 31.) Wallace informed him that someone had observed a vehicle drive up near the property just prior to the fire and saw them removing items from the shed. (DE 65 at 31.) She further stated that her ex-husband was vindictive and could be responsible for the fire. (DE 65 at 32-33.) The anniversary of her mother's death was the day prior, so she thought there might be a connection. (DE 65 at 33.)

O'Bryan applied for a search warrant to collect the DVR and recording device ("DVR Warrant") from Quinicino's home in attempt to determine if the video footage contained any information related to the fire. (DE 65 at 14.) Thereafter, O'Bryan—in accordance with routine procedures—contacted the Lexington Police Department to help him execute the warrant. (DE 65 at 15.) Upon asking for assistance, based on the smell of marijuana on

Quinicino and location of the home, the Police Department told O'Bryan to contact the lieutenant from narcotics. (DE 65 at 15 and 46.)

Two narcotics officers, Detectives Jared Curtsinger and Matthew Evans, met up with O'Bryan and other fire investigators near the Defendants' home. (DE 65 at 15-16.) They attempted to execute the DVR Warrant on Apartment 3 of the duplex, but no one was home. (DE 65 at 16.) Noticing that Dorothy's car was in the driveway, O'Bryan made contact and asked if she could call Quinicino to come to the scene. (DE 65 at 16.) She did, and Quinicino arrived shortly thereafter. (DE 65 at 16.)

Quinicino pulled up to the home with his cousin, Vance Waide. (DE 65 at 17-18.) Officers explained that they were there to execute a search warrant for the DVR and recording equipment. (DE 65 at 18.) At that time, Quinicino told officers that he could just go up to the apartment and get the recording equipment for them. (DE 65 at 18.) Officers informed Quinicino that they already had taken the steps to secure a warrant and intended to execute it. (DE 65 at 18.)

Officers then asked Quinicino if he had any marijuana or other drugs in the apartment. (DE 65 at 18.) Quinicino advised that he had a little marijuana in the apartment. (DE 65 at 18 and 124.) Curtsinger then walked over to Quinicino's vehicle, which was parked on the public street outside the home. (DE 55-4 at 5.) The windows of the vehicle were down, and Curtsinger smelled marijuana emanating from his car. (DE 55-4 at 5.) Curtsinger located a burnt marijuana cigarette and grinder in the console area. (DE 55-4 at 5.) Based on his findings and Quinicino's admission, Curtsinger decided to leave the residence to get another search warrant for Apartment 3. (DE 65 at 19.) Some time during this interaction, Quinicino was detained by officers. (DE 65 at 18, 92-93, and 103.)

Everyone else remained at the residence. Quinicino remained detained, but Dorothy and Vance were free to move in and out of Apartment 1. (DE 65 at 19.) Officers were told there

was no access from Apartment 1 to Apartment 3. (DE 65 at 76.) While waiting for Curtsinger's return, Vance and Quinicino were observed having a series of hushed communications. (DE 65 at 19-20.) Vance and Dorothy were also observed going back and forth in and out of Apartment 1. (DE 65 at 19-20.)

Then, Vance and Dorothy entered and remained in Apartment 1. (DE 65 at 60-61.) The door to the apartment was shut and the blinds were closed. (DE 65 at 61 and 75.) The officers and fire investigators continued to observe from outside the home while waiting for Curtsinger to return. (DE 65 at 61 and 75-76.)

One of the fire investigators, Lieutenant Anthony Johnson, informed the other individuals at the scene that he had heard loud banging coming from inside Apartment 1 that sounded like the ceiling was being pulled down. (DE 65 at 21, 63, and 75.) He additionally observed the drip line pipes from an air conditioner connected to Apartment 3 moving substantially. (DE 65 at 62.) He then informed O'Bryan that he believed someone was in Apartment 3. (DE 65 at 63.) At that time, officers got the key and entered Apartment 3. (DE 65 at 22 and 77.)

Evans began clearing the apartment to make sure no one was in Apartment 3. (DE 65 at 78.) In his sweep, he encountered a large hole, approximately four-by-four feet, leading up from Apartment 1. (DE 65 at 23 and 79.) Through the hole, Evans observed dry wall and insulation scattered across the kitchen floor of Apartment 1 and a step ladder leading up to Apartment 3. (DE 65 at 79.) Officers promptly ran down to make sure no one was fleeing from Apartment 1 or destroying evidence. (DE 65 at 23 and 49.)

Upon entry of Apartment 1, the bathroom and kitchen sinks were overflowing and clogged with a white substance. (DE 65 at 82 and 85.) The occupants were detained and escorted out of the residence. (DE 65 at 82.) Evans turned off both sinks and went outside to wait for

Curtsinger to return with the search warrants.  (DE 65 at 82.)  Officers still had yet to search either apartment.  (DE 65 at 84.)

Approximately two hours later, Curtsinger returned with search warrants (Narcotics Warrants) for Apartment 1 and Apartment 3.  (DE 65 at 40.)  He had been in contact with Evans who relayed him information from the scene.  (DE 65 at 104.)  They executed the warrants on both apartments, found a firearm, large quantities of money and drugs, and collected the DVR.  (DE 65 at 52 and 90.)

Defendants Quinicino and Dorothy now move this Court to suppress all evidence against them. (DE 55 and 56). They assert the following: (1) the DVR Warrant lacks probable cause, is overly broad, and was not the least intrusive means available to obtain the camera system; (2) all evidence found during the execution of the DVR Warrant must be suppressed as fruit of the poisonous tree; (3) the Defendant's *Miranda* rights were violated;  and (4) exigent circumstances cannot justify police entry.  (DE 55 and 69.)  At the Suppression Hearing, the Court heard further arguments and evidence regarding the suppression issues.  The Court considers the parties' arguments below.

## II. ANALYSIS

### A. There was probable cause for the DVR Warrant.

There was sufficient probable cause for the DVR Warrant secured by Captain O'Bryan. The Fourth Amendment requires that all warrants issued be based on probable cause.  U.S. Const. Amend. IV.  Probable cause exists when there is a fair probability—given the totality of the circumstances—that contraband or evidence of a crime will be found in a particular place. *United States v. Loggins*, 777 F.2d 336, 338 (6th Cir. 1985).  It only requires that there be a substantial chance of finding criminal activity.  *See Illinois v. Gates*, 462 U.S. 213, 243 (1983). There is sufficient probable cause when the facts available would warrant a reasonable man to believe that evidence of a crime is located in a certain place.  *Texas v.*

*Brown*, 460 U.S. 730, 742 (1982). A Magistrate's decision regarding a finding of probable cause should be awarded great deference and his discretion reversed only if it was arbitrarily exercised. *United States v. Algie*, 721 F.2d 1039, 1041 (6th Cir. 1983); *United States v. Allen*, 211 F.3d 970, 973 (6th Cir. 2000). If there was a substantial basis for the Magistrate's determination of probable cause, then the reviewing court must uphold his decision. *Gates*, 462 U.S. at 236.

When an unnamed witness provides the majority of the factual information to support a search warrant, the Court must consider the veracity, reliability, and basis of knowledge for the information as part of the totality of the circumstances. *United States v. Dyer*, 580 F.3d. 386, 390 (6th Cir. 2009). Two factors are often used to determine whether an affidavit based on an unnamed witness's story provides a substantial basis for finding probable cause: (1) whether the affidavit contains an explicit and detailed description of the alleged wrongdoing—events observed first-hand are given greater weight; and (2) whether police have independently worked to corroborate the tip. *See Gates*, 462 U.S. at 233. Neither of these factors are dispositive, and they should be considered together with all other circumstances. *Id. See also United States v. Weaver*, 99 F.3d 1372, 1377 (6th Cir. 1998).

In the present case, there was probable cause for the DVR Warrant. In applying for the DVR warrant, O'Bryan stated the following:

> "As I began the investigation, it was determined that someone entered the property through one of the two gates in the fence, proceeded back to the rear, where the shed was located. According to the victim, a witness explained to her that someone was observed pulling up to the residence, entering the property and removing items from the shed around the time of the fire. The victim estimated the items stored inside the shed to be valued around $8,000. She explained the items stored were antique possessions that belonged to her deceased mother. At the completion of the investigation, the fire has been determined to have been incendiary in nature. During the course of the investigation, the residence directly next door (430 Douglas Ave), just feet away from one of the two gates on the property where the arson occurred, has evidence to indicate there is a surveillance camera system on the property. The cameras are located on the exterior and would capture public view outside of the residence at 430 Douglas Avenue, capturing video of the property where the arson

occurred. An attempt was made to get consent from the owner of the property on the afternoon of July 23. He denied giving of [*sic*] any videos captured from his surveillance system. (DE 55-2 at 3.)

Considering the totality of the circumstances, the Court finds that there was sufficient probable cause. There was a fair probability that evidence relating to the shed fire would be located on the recording equipment mounted on the neighboring property. Even though the warrant relies on an unnamed witness, there is sufficient corroborating evidence consistent with the statements in the affidavit. Upon O'Bryan's initial arrival at the fire scene, he was informed by the incident commander that items had been removed from the shed and appeared to have been set on fire in the lawn. (DE 65 at 5.) The incident commander further informed O'Bryan that the house on the property was vacant and possibly used by squatters. (DE 65 at 5.) O'Bryan's communications with the victim, Wallace, were all consistent with his observation and investigation of the scene. Additionally, Wallace identified some of the items in the shed for O'Bryan, including an antique motorcycle and typewriter. (DE 65 at 44.) O'Bryan testified that during his investigation, he located the motorcycle, but not the typewriter. (DE 65 at 44.) This further supports the accuracy of the information in the affidavit.

Defense also asserts that the victim did not relay her account of the witness's story until after O'Bryan had applied for the search warrant. (DE 69 at 2.) Defense points out that the victim did not provide O'Bryan with the witness's account until July 24, 2018—the same day the search warrants were executed. (DE 69 at 2-3.) But the Defendants argument would require either a massive coincidence or O'Bryan to have psychic abilities. The Court finds it extremely unlikely that O'Bryan would fabricate an incident in his affidavit only to have his fabrication be the exact story given by the victim. Instead, the Court opines that the victim gave her account to O'Bryan the same morning he applied for the DVR search warrant, which was signed at 10:21 a.m. on July 24, 2018. (DE 55-2 at 2.)

Moreover, the affidavit does not exclusively rely on the statement of the witness. It also relies on the location and position of the recording devices. (DE 55-2 at 3.) Defense points out that the cameras do not directly capture the shed and that any footage would have been recorded at night, in the dark. (DE 65 at 26-27 and 120.) However, cameras and recording equipment come in a range of sophistication, and it is impossible to know how wide the camera angle is or whether there was sufficient light to capture activity without reviewing the footage. Additionally, even if the cameras did not capture the actual fire, the footage would have been helpful in developing critical information about the activity in the area during the hours leading up to the fire.

A search warrant must also demonstrate cause to believe that evidence is likely to be found at the place to be searched. *Groh v. Ramirez*, 540 U.S. 551, 568 (2004). There must be a nexus between the item to be seized and the criminal behavior. *Warden Md. Penitentiary v. Hayden*, 387 U.S. 294, 307 (1967). The Defendants state:

> To justify a search of the apartment to seize any video recording system owned by Mr. Waide…police needed reason to think not only that he possessed such a system, but also that the device would be located in the home and would contain incriminating evidence. With respect to these additional considerations, other than noting the cameras on the back of the building, the affidavit set out no reason to believe the recording was "likely to be found at the place to be searched." (DE 55 at 9.)

But there were additional considerations other than noting the cameras on the back of the building. The affidavit clearly establishes that O'Bryan attempted to get consent from Quinicino to view the footage and that Quinicino refused to provide him with the equipment. (DE 65 at 13.) Quinicino's refusal represents that he had dominion and control over the equipment, which supports that the system would be located in his home. The fact that he may have indicated that there was no recording is not of consequence. There is no law requiring that O'Bryan take his "word" at face-value—otherwise officers would rarely be able to secure search warrants. Also, as established above, it was likely that the system would

contain incriminating evidence based on the location and position of the cameras combined with the victim's account of the witness's statement.

Defendants further argue that the warrant was overbroad and not the least intrusive means because officers could have issued a subpoena to obtain the video recordings. But the DVR Warrant was specifically limited to obtaining "[a]ll equipment that can produce or reproduce images to include but not limited to CD/DVD copying equipment or digital video recording devices, which produces images to the outside public view." (DE 55-2 at 2.) Fire investigators are considered peace officers with the power to arrest and issue warrants. (DE 65 at 4.) O'Bryan asked Quinicino to provide the surveillance equipment, and he refused. (DE 65 at 13.) O'Bryan made a logical decision in investigating the fire to exercise his powers as a peace officer and obtain a search warrant for the surveillance equipment, which likely contained pertinent information. His warrant was strictly limited to obtaining any DVR and surveillance equipment. (DE 55-2 at 2-3.) The Court is aware of no law which would require O'Bryan to take Quinicino's "word" that there was no footage. Accordingly, the Court finds that the warrant is not overbroad and that there was a sufficient nexus between the item to be seized and the criminal behavior. *See Warden*, 387 U.S. at 307.

The investigative methods used by officers should also be the least intrusive means reasonably available to verify and dispel the officer's suspicion. *Florida v. Royer*, 460 U.S. 491, 500 (1982). While the Court recognizes the possibility of obtaining the equipment by subpoena, O'Bryan was not required to do so. O'Bryan obtained a warrant because of Quinicino's refusal to provide him with the equipment. (DE 65 at 34-35.) O'Bryan testified that usually individuals provide consent for such items upon request to help aid in the investigation. (DE 65 at 35.) Quinicino's refusal to let O'Bryan review the equipment is sufficient to support a conclusion that even if there was evidence of the crime on the surveillance equipment, he was not going to provide it. A subpoena would have given

Quinicino the opportunity to alter or destroy the evidence. Accordingly, the Court will not scrutinize O'Bryan's decision to obtain a search warrant because he was justified in doing so.

The Magistrate's determination of probable cause should not be disturbed because the location and position of the cameras combined with the victim's account of the witness's statement provide a substantial basis to find probable cause. *See Gates*, 462 U.S. at 236. Because there was probable cause to support the DVR Warrant, the evidence should not be suppressed as fruit of the poisonous tree.[1]

### B. The good faith exception.

A search warrant issued by a Magistrate that is subsequently determined to be invalid does not require suppression if the officer acted in good faith and within the scope of the warrant. *United States v. Leon*, 468 U.S. 897 (1984). There are four exceptions to this rule: (1) the affidavit contains information that the affiant knew or should have known to be false; (2) the issuing Magistrate lacked neutrality and detachment; (3) the affidavit is devoid of information to support a probable cause determination making any belief that probable cause exists completely unreasonable; or (4) the warrant is facially deficient. *Id.* However, Courts only need to address the issue of the good faith exception when a search warrant is issued without probable cause. *See Illinois v. Krull*, 480 U.S. 340, 347 (1987).

Here, the Defendants argue that the affidavit to support the DVR Warrant is devoid of information to support a probable cause determination making any belief that probable cause exists completely unreasonable. (DE 55 at 13.) The Court determined that the DVR Warrant was based on probable cause. Accordingly, the Defendants argument regarding the good faith exception is moot.

---

[1] The fruit of the poisonous tree doctrine requires a Court to suppress all evidence stemming from a search warrant that lacks probable cause. *See Wong Sun v. U.S.*, 371 U.S. 471 (1963).

But even if the DVR Warrant was not based on probable cause, the affidavit certainly was not devoid of information to support a probable cause determination making any belief that probable cause exists completely unreasonable. The affidavit includes the following information to support probable cause: (1) the account of the victim that there were antique possessions inside the shed; (2) that a witness told the victim that someone was observed pulling up to the home and removing items from the shed around the time of the fire; (3) that there were gates in the backyard allowing entry and exit; (4) that the fire was determined to be incendiary in nature; (5) the location and position of nearby surveillance equipment mounted on the Defendants' home; (6) the officer's attempt to get consent to search the equipment; and (7) an account of Quinicino's refusal to provide the equipment. (DE 55-2 at 3.) There is nothing to indicate that the officers did not act in good faith or within the scope of the warrant they were executing. Consequently, if the DVR warrant lacked sufficient probable cause, the good faith exception would be applicable, and suppression would not be required.

## C. Probable cause for the Narcotics Warrants and search of Quinicino's vehicle.

Although it appears that the Defendants do not contest the probable cause for the vehicle search or Narcotics Warrants, out of an abundance of caution, the Court will address the probable cause for each.

The Narcotics Warrant for Apartment 3 is based on probable cause because there was a fair probability—given the totality of the circumstances—that contraband would be found. *See Loggins*, 777 F.2d at 338. Here, Officers were on the scene executing the DVR Warrant. (DE 65 at 16-18.) They requested Quinicino come to the scene so that they could enter Apartment 3 without having to destroy his property. (DE 65 at 95.) Upon arrival, Quinicino parked his car on the public street with the windows open. (DE 55-4 at 5.) Officers asked Quinicino if he had marijuana in Apartment 3, to which he replied he did. (DE 65 at 18 and

12

124.) This admission alone is sufficient to establish a fair probability that marijuana would be found in Apartment 3. *See Groh*, 540 U.S. at 568.

Curtsinger then walked over to Quinicino's vehicle. (DE 65 at 92.) He immediately detected an odor of marijuana emanating from his car. (DE 65 at 102.) In the Sixth Circuit, there is sufficient probable cause to search a vehicle without a warrant where officers detect the smell of marijuana. *See United States v. Foster*, 376 F.3d 577, 583-84 (6th Cir. 2004). In accordance with Sixth Circuit precedent, Curtsinger searched Quinicino's vehicle and found a burnt marijuana cigarette and grinder in the console area. (DE 65 at 102.)

The officers then made a conservative decision to seek another search warrant for drugs in Apartment 3. (DE 65 at 103.) Curtsinger left the scene to obtain the warrant, and the remaining officers were waiting for him to return to begin any search. (DE 65 at 103.) Officers were told that Apartment 3 was empty and that there was no access from Apartment 1. (DE 65 at 76.) Consequently, when the blinds and doors closed to Apartment 1, the officers heard loud banging, and observed pipes connected to Apartment 3 move substantially, they became immediately concerned that someone had accessed Apartment 3 to destroy evidence. (DE 65 at 77.) Police then made decision to enter Apartment 3 on the basis of exigent circumstances.

But the officers still did not search Apartment 3. Instead, they conducted a protective sweep to secure the scene and prevent further tampering or destruction of evidence. (DE 65 at 78.) During this sweep, the hole leading from Apartment 1 to Apartment 3 was discovered. (DE 65 at 23 and 79.)

At this point, probable cause to search Apartment 1 was established and there was a fair probability that contraband would be found in Apartment 1. *See Loggins*, 777 F.2d at 338. Officers justifiably believed someone had gained access to Apartment 3, and they did not know whether evidence had been tampered with, removed, or destroyed. (DE 65 at 49, 77,

and 104.) Appropriately, officers immediately ran down to Apartment 1 to secure the premises. (DE 65 at 23 and 49.)

Upon entry of Apartment 1, the officers observed multiple sinks overflowing and clogged with a white substance. (DE 65 at 82 and 85.) But still, the officers did not conduct a search and instead, did another sweep. (DE 65 at 82.) They located, detained, and removed all occupants of Apartment 1. (DE 65 at 82.)

Once the scene was secured, the officers waited for Curtsinger to return before they searched either Apartment. (DE 65 at 84.) Detective Evans telephonically relayed the events at the scene while Curtsinger drafted the Narcotics Warrants. (DE 65 at 104.) It was not until Curtsinger returned with the warrants that officers finally searched both apartments and located a firearm and large quantities of cash and drugs. (DE 65 at 52 and 90.)

The above circumstances are fully relayed in the affidavits used to support the Narcotics Warrants and are sufficient to establish probable cause. These circumstances would warrant a reasonable man to believe that evidence of a crime would be located in both apartments. *See Brown*, 460 U.S. at 742. There was a substantial basis for the Magistrate's determination of probable cause, and his decision should not be disturbed. *See Gates*, 462 U.S. at 236.

### D. Quinicino's Constitutional rights were not violated, and the evidence should not be suppressed as fruit of the poisonous tree.

Defendants argue that Quinicino's incriminating statements about marijuana were obtained by police in violation of *Miranda v. Arizona.* (DE 69 at 3.) They assert that this was a constitutional violation requiring all evidence obtained thereafter to be suppressed as fruit of the poisonous tree. (DE 69 at 4.)

*Miranda v. Arizona* requires that a defendant subject to a custodial interrogation be read certain warnings to apprise him of his rights under the Fifth Amendment. *See Miranda v. Arizona*, 384 U.S. 436 (1966). If there is a custodial interrogation, the accused statement is

inadmissible unless the prosecution can establish that the accused knowingly and voluntarily waived his *Miranda* rights while making the statement. *Berghuis v. Thompkins*, 560 U.S. 370, 382 (2010). Evidence obtained in violation of *Miranda* must be suppressed as fruit of the poisonous tree unless intervening events break the causal connection. *See Taylor v. Alabama*, 457 U.S. 687, 690 (1982).

However, *Miranda* rights are only triggered upon a custodial interrogation. *See Miranda*, 384 U.S. at 444. To be in custody for *Miranda* purposes, the person must either be under formal arrest or have his freedom of action curtailed to a degree typically associated with formal arrest. *United States v. Cash*, 733 F.3d 1264 (10th Cir. 2013). But "not all restraints on freedom of movement amount to custody for purposes of *Miranda*." *Howes v. Fields*, 565 U.S. 499, 509 (2012). In this analysis, Courts must consider whether the environment presents the same inherently coercive pressures as stationhouse questioning. *Id.* Courts consider the location of the questioning, its duration, statements made during the interview, the presence or absence of physical restraints during the questioning, the release of the interviewee at the end of questioning, and any other factor that might be relevant. *Id.* Interrogation refers to "any words or action on the part of the police, other than those normally attendant on arrest and custody, that the police should know are reasonably likely to elicit an incriminating response." *Rhode Island v. Innis*, 446 U.S. 291 (1980).

Clearly, an officer's question regarding marijuana possession is reasonably likely to elicit an incriminating response. However, the Court finds that Quinicino was not in "custody" as defined by *Miranda* and its progeny. Evans and Curtsinger both testified that Quinicino was not placed into handcuffs until after they asked him about the marijuana. (DE 65 at 93 and 102-103.) The relevant factors indicate that Quinicino was not "in custody" when the officers asked him about the marijuana. Here, officers asked Dorothy to contact Quinicino to come

to the scene so that they could peacefully execute a validly obtained search warrant out of courtesy for his property. (DE 65 at 95.) When Quinicino arrived, officers informed him that they were investigating his neighbor's shed fire and there to execute a search warrant for the video equipment, which he refused to release the day before. (DE 65 at 18.) The Court considers that Quinicino was not handcuffed or restricted in any way; he was permitted to talk with his family and friends; he was asked about the marijuana in a familiar location— his own front yard; the duration of questioning was only a couple seconds; and Quinicino was not even under investigation for the fire. (*See* DE 65.)

The Court, however, recognizes that O'Bryan's testimony is somewhat inconsistent with the testimonies of Evans and Curtsinger. O'Bryan indicated that Quinicino was detained before officers asked him about the marijuana. (DE 65 at 18). He testified that Quinicino stated "[i]f you let me out of these handcuffs, I'll go get that video for you" prior to being asked about the marijuana. (DE 65 at 18.) The Court first notes that this statement further supports that Quinicino knew he was not in custody because no reasonable person believing he was in custody would think it was an option to go and retrieve the items listed in a search warrant. The Court also notes that O'Bryan testified that it was Curtsinger who placed the handcuffs on Quinicino. (DE 65 at 36.) The Court believes that Curtsinger—who physically placed the handcuffs on Quinicino—is in a better position to recall when he did so. But even if Quinicino had been detained prior to being asked about the marijuana, he still would not have been in custody for *Miranda* purposes.

There are situations that "exist where a person is detained but not in *Miranda* custody because such detention does not sufficiently impair the detained person's free exercise of his privilege against self-incrimination to require that he be warned of his constitutional rights." *United States v. Couch*, No. 13-03-GFVT, 2013 WL 6095512 (E.D. Ky. Nov. 20, 2013). The Supreme Court has held that officers executing a search warrant may detain the occupants

of the premises in the immediate vicinity while a proper search is conducted, even when there is no particular suspicion that an individual is involved in criminal activity or poses a specific danger to the officers. *See Michigan v. Summers*, 452 U.S. 692, 705 (1981); *Muehler v. Mena*, 544 U.S. 93 (2005); *Bailey v. United States*, 568 U.S. 186 (2013). Detaining occupants facilitates the completion of a search and prevents unrestrained occupants from hiding or destroying evidence. *See Summers*, 452 U.S. at 703.

The Court finds that even if Quinicino was detained prior to officers asking whether he possessed marijuana, he was not in custody for *Miranda* purposes because—in addition to the factors considered above—he was an occupant of the premises in the immediate vicinity and detained for the purpose of executing a validly obtained search warrant based on probable cause. Accordingly, Officers were not required to read Quinicino *Miranda* rights even though they asked him a question that was reasonably likely to elicit an incriminating response.

**E. Exigent circumstances warranting police entry.**

Without regard to the probable cause determination, exigent circumstances warranted police entry into Apartment 3 and then Apartment 1. The government bears the burden of proving that exigent circumstances existed that warranted police entry. *See Welsh v. Wisconsin*, 466 U.S. 740, 749-50 (1984).

Exigent circumstances are present where there is an urgent need to prevent evidence from being lost or destroyed. *Kentucky v. King*, 563 U.S. 452, 474 (6th Cir. 2005). The Sixth Circuit has adopted a two-prong-test to determine whether the possibility of destruction of evidence will justify warrantless entry into a person's home: (1) whether there is reasonable belief that third parties are inside the dwelling; and (2) whether there is reasonable belief that these third parties may soon become aware the police are on their trail, so that the

destruction of evidence would be in order. *United States v. Sangineto-Miranda*, 859 F.2d 1501, 1512 (6th Cir. 1988).

The Defendants assert that "closing blinds and making noise should in no way justify the warrantless search in this case." (DE 55 at 16.) The Defendants use *Johnson v. United States* to support their argument. (DE 55 at 15-16.) In *Johnson*, police smelled burning opium and heard shuffling noise coming from inside a hotel room. *Johnson v. United States*, 333 U.S. 10, 12 (1948). The court held that there were no exceptional circumstances warranting entry because there was little risk that drug-related evidence would have been destroyed pending a warrant execution. *Id.* at 14-15. The Defendants argue that even if the drugs were being moved between the apartments, the warrant could have been broadened to search both apartments. (DE 55 at 16.)

*Johnson* is distinguishable from the present case. There, police smelled burning opium, knocked and announced their presence, then heard shuffling noises. *Johnson*, 333 U.S. at 12. At the time police smelled the opium, there was no reason for the defendant to believe that they were on her trail and that she needed to destroy the evidence. The officers in that case could have easily secured a warrant prior to their entry. *See id.* at 15.

In the present case, at the time police observed the blinds and doors being shut, heard loud banging, and saw pipes originating from Apartment 3—which was supposedly empty— move substantially, all parties were aware that the police were on their trail. Officers were on the premises for the purpose of executing the DVR Warrant when Quinicino admitted to possessing marijuana in his apartment. (DE 65 at 18). Curtsinger had left the scene to obtain another warrant for narcotics based on Quinicino's own admission, which was known to the parties on the scene. In fact, the officers actively chose to wait to execute the DVR Warrant until a Narcotics Warrant for Apartment 3 was obtained. (DE 65 at 21.) While they

were waiting for Curtsinger to return, the remaining officers observed the blinds and doors being closed and heard loud banging. (DE 65 at 21, 61, 63, and 75.) Additionally, prior to this sequence of events, officers were specifically told that Apartment 3 was vacant and that there was no access to Apartment 3 from Apartment 1. (DE 65 at 76.) Consequently, when they saw pipes clearly connected to Apartment 3 move substantially, their immediate concern was that access to Apartment 3 had been gained from Apartment 1 and evidence was being destroyed. (DE 65 at 77.)

Applying the two-prong-test to the entry of Apartment 3, pipes moving substantially that are directly connected to an apartment that is supposedly vacant would cause reasonable belief that someone was inside. The parties were also aware that police were on their trail and that the destruction of evidence was in order—all parties were aware that officers were present to execute the DVR Warrant, that Quinicino had admitted to possessing marijuana in Apartment 3, and that Curtsinger had left to obtain another warrant for drugs. Accordingly, the Court finds that exigent circumstances warranted entry into Apartment 3, even without the existence of the DVR Warrant.

Exigent circumstances also justified entry into Apartment 1. Entry into Apartment 3 was permissible based on the analysis above. When the officers entered Apartment 3, they did not begin searching. Instead, they conducted a protective sweep. (DE 65 at 78.) The Fourth Amendment permits protective sweeps undertaken by a searching officer if he "possessed a reasonable belief based on specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warranted the officer in believing that the area swept harbored an individual posing a danger to the officers or others." *Maryland v. Buie*, 494 U.S. 325, 327 (1990). "The sweep must be limited to a cursory search of the premises for the purpose of finding persons hidden there who would threaten the officer's safety." *United States v. Taylor*, 248 F.3d 506, 513-14 (2001).

Officers possessed a reasonable belief that someone was in Apartment 3 because (1) they were directly told that Apartment 3 was vacant and could not be accessed via Apartment 1; and (2) they observed substantial movement of pipes directly connected to that unit. (DE 65 at 62 and 76.) When they entered the unit, they began conducting a sweep. (DE 65 at 78.) Officers opened up a knee wall door on the side of the kitchen area approximately the size of a utility closet. (DE 65 at 79.) There, officers discovered a large hole and step ladder leading from Apartment 1. (DE 65 at 79.) Insulation and drywall covered the area—consistent with a freshly wrecked ceiling. (DE 65 at 79.) The officers justifiably believed someone had gained access to Apartment 3 via the fresh hole and feared tampering. At this point, exigent circumstances existed warranting entry into Apartment 1 because there was an urgent need to prevent evidence from being lost or destroyed.

Even without the DVR Warrant, officers were justified in entering both Apartments on the basis of exigent circumstances and the need to conduct a protective sweep. Quinicino, on his own admission, had marijuana located within his apartment. (DE 65 at 18.) Officers, rather conservatively, chose to seek an additional search warrant for drugs based on Quinicino's admission. (DE 65 at 19.) While seeking that warrant, officers observed the blinds and doors close to Apartment 1, heard loud banging consistent with the ceiling being destroyed, and observed substantial movement of pipes connected to Apartment 3. (DE 65 at 21, 61, 63, and 75.) These circumstances are sufficient to establish a reasonable belief that someone had gained access to Apartment 3 and could pose a danger or be destroying evidence. Accordingly, the Court concludes that the officers' entry into both apartments was permissible.

### III. CONCLUSION

Based on the foregoing, the Court finds that entry into Apartment 3 was permissible on multiple grounds: (1) the DVR Warrant based on probable cause; (2) exigent circumstances;

and (3) the need to conduct a protective sweep.  Entry into Apartment 1 was permissible on the basis of exigent circumstances after the hole was discovered in Apartment 3. Additionally, the Court finds that there was probable cause for the Narcotics Warrants and that the Defendants' Constitutional rights were not violated.  Accordingly, the evidence will not be suppressed as fruit of the poisonous tree.

Based on the foregoing, **IT IS HEREBY ORDERED** that the Defendants' Motion to Suppress (DE 55) is **DENIED**.

Dated April 8, 2019.

KAREN K. CALDWELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY